IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| CAMERON L.,<br><br>                    Plaintiff,<br><br>        vs.<br><br>KILOLO KIJAKAZI, Acting<br>Commissioner of the Social Security<br>Administration,<br><br>                    Defendant. | **8:20CV440**<br><br><br>**MEMORANDUM<br>AND ORDER** |

This is an action under 42 U.S.C. § 405(g) for judicial review of the Social Security Commissioner's final decision denying Plaintiff's application under Title XVI of the Social Security Act, 42 U.S.C. § 1381-1383f, for supplemental security income ("SSI") benefits.[1] *See* 42 U.S.C. § 1383(c)(3) ("The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title."). For the reasons discussed below, the Commissioner's decision will be affirmed.

## I. BACKGROUND

### A. Procedural History

Plaintiff applied for SSI benefits on January 3, 2012, when he was 55 years old. Plaintiff claimed he was disabled due to blindness, mental illness, a brain tumor, and a "pierced heart." The alleged disability onset date was March 1, 2000. (Filing 19-5, Tr. 178-184; Filing 19-6, Tr. 197).

---

[1] In accordance with General Order No. 2015-15, the matter is submitted to the court on cross-motions (Filings 33, 37), based on review of the parties' pleadings and briefs and the administrative record (Filing 19).

The claim was denied initially on June 21, 2018. (Filing 19-3, Tr. 106-122). Plaintiff requested a hearing on June 27, 2018, and 16 months later, on October 23, 2019, he appeared and testified before an administrative law judge ("ALJ"). (Filing 19-4, Tr. 129-130; Filing 19-2, Tr. 54-55, 60-100). An impartial vocational expert ("VE") also testified at the hearing (Filing 19-2, Tr. 54-55, 100-104). Although informed of the right to representation, Plaintiff chose to appear and testify without the assistance of an attorney or other representative. (Filing 19-2, Tr. 56-59).

The ALJ issued an unfavorable decision on November 13, 2019. (Filing 19-2, Tr. 24). The Appeals Council denied Plaintiff's request for review on September 9, 2020. (Filing 19-2, Tr. 1-5). This action was timely commenced on October 21, 2020 (Filing 1). Plaintiff appears pro se, and has been granted leave to proceed in forma pauperis. (See Filing 5).[2]

### B. The ALJ's Decision

Using the sequential analysis prescribed by Social Security regulations,[3] the ALJ made the following findings:

---

[2] Plaintiff's requests for appointment of counsel were denied by the court on March 3, March 22, August 9, 2021. (Filings 21, 27, 34).

[3] *See* 20 C.F.R. § 416.920(a). At step one, the claimant has the burden to establish that he or she has not engaged in substantial gainful activity since his or her alleged disability onset date. At step two, the claimant has the burden to prove he or she has a medically determinable physical or mental impairment or combination of impairments that significantly limits his or her physical or mental ability to perform basic work activities. At step three, if the claimant shows that his or her impairment meets or equals a presumptively disabling impairment listed in the regulations, he or she is automatically found disabled and is entitled to benefits. If not, the ALJ determines the claimant's residual functional capacity ("RFC"), which the ALJ uses at steps four and five. At step four, the claimant has the burden to prove he or she lacks the RFC to perform his or her past relevant work. If the claimant can still do his or her past relevant work, he or she will be found not disabled; otherwise, at step five, the burden shifts to the Commissioner to prove, considering the claimant's RFC, age, education, and work experience, that there are other jobs in the national economy the claimant can perform.

1. The claimant has not engaged in substantial gainful activity since January 3, 2018, the application date (20 CFR 416.971 *et seq.*).

2. The claimant has the following severe impairments: seizure disorder secondary to benign neoplasm of brain, status post resection (2009); and mood disorder, variously diagnosed as bipolar disorder and depression (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c) except that he cannot climb ladders or operate motor vehicles. He can have no exposure to unprotected heights. From a mental standpoint, he is able to understand, remember, carry out, and persist at tasks that are simple, straightforward, and uncomplicated. He is able to exercise proper judgment in performing those tasks and to respond appropriately to routine changes in the workplace and to routine supervision. He is able to respond and behave appropriately with others when performing tasks so long as they do not require more than incidental and superficial social interaction.

5. The claimant has no past relevant work (20 CFR 416.965).

6. The claimant was … 55 years old, which is defined as an individual of advanced age, on the date the application was filed (20 CFR 416.963).

7. The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant

numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since January 3, 2018, the date the application was filed (20 CFR 416.920(g)).

(Filing 19-2, Tr. 29-40 (ALJ's discussion of findings omitted)).

## II. EVIDENTIARY MATERIALS

On May 7, 2014, Roger Izzi, M.D., performed a consultative psychological evaluation of Plaintiff. She noted that Plaintiff maintained a valid California driver's license with an expiration date of 2018. Plaintiff stated that he lived alone, relied on food stamps to buy food, and did not belong to clubs, groups, or organizations, and did not attend church or see family or friends. He reported occasional crying spells and endorsed auditory hallucinations. He claimed to have only a fifth-grade education. A mental status examination revealed that Plaintiff was alert, and casually dressed and groomed. He used a white cane to enter and leave the exam room and reported that he could only see shadows. Plaintiff described his mood as "agitated" and his affect appeared dysphoric. His speech was normal and Dr. Izzi noted no signs of hallucinations. Based on his review of Plaintiff's medical records, Dr. Izzi's diagnostic impressions were unspecified bipolar disorder and antisocial personality disorder. He opined that Plaintiff's mood disorder was likely to limit his abilities to perform simple and repetitive or complex tasks on a consistent basis over an 8-hour period; he would have a moderate limitation in his ability to get along with peers or to submit to supervision in a work-like setting, and he did not appear capable of responding to usual work session situations regarding attendance and safety or of dealing with changes in a routine work setting (Filing 19-7, Tr. 410-413).

On June 27, 2014, Jonathan Macy, M.D., performed a consultative ophthalmological examination of Plaintiff. Plaintiff reported a history of brain surgery for meningioma 5 years prior with poor visual acuity since that time. Dr. Macy noted that Plaintiff's visual acuity without glasses was "CF" (counts fingers) and that refraction was of no help. The remainder of Plaintiff's examination was within normal limits. Dr. Macy diagnosed Plaintiff with cortical blindness based on his history (Filing 19-7, Tr. 404).

On September 15, 2017, Plaintiff saw Tirath Gill, M.D., at the California Substance Abuse Treatment Facility ("SATF"). Dr. Gill noted that Plaintiff was wearing a "vision vest." A mental status examination was normal (Filing 19-7, Tr. 322).

On September 22, 2017, Plaintiff saw Robert Scharffenberg, M.D., at SATF, and asked to see the neurologist he saw for his April 2017 head injury. Plaintiff stated that he was feeling well. Plaintiff was alert, interactive, and in no acute distress. He was able to name the President and city, but not the date. He was able to perform serial subtractions, though he did so slowly (Filing 19-7, Tr. 318).

On September 25, 2017, Plaintiff saw Barbara Fannin, Ph.D., at SATF. The session focused on Plaintiff's continued violation of rules. A mental status examination revealed that Plaintiff was acceptable and his behavior cooperative. He was alert and oriented, and while his mood was labile, his affect was unremarkable. Plaintiff's reported problems with attention, concentration, and memory and endorsed auditory and visual hallucinations; however, his speech, thought process, thought content, and insight were normal. He denied any homicidal or suicidal ideation (Filing 19-7, Tr. 323).

On October 3, 2017, Plaintiff saw Dr. Scharffenberg at SATF, asking about a follow up appointment regarding surgical repair of his left nasal passage and raising concerns about a history of "bleeding of the brain." He also stated that he brought dark glasses to prison with him and asked that it be documented in his medical record—though he was not wearing any glasses at the time of the visit. He was wearing a vision impaired vest. Dr. Scharffenberg noted that, while an April 2017 computer tomography of Plaintiff's head documented a traumatic subarachnoid hemorrhage, it showed no signs of meningioma. Plaintiff stated that he felt well. He also said that his last seizure occurred more than 6 months prior. Dr. Scharffenberg noted that Plaintiff was alert, interactive, and in no acute distress (Filing 19-7, Tr. 316-317).

On October 23, 2017, Plaintiff saw Sunil Jacques, M.D., at SATF for a telepsychiatry visit. Plaintiff reported that his medications were working well, and he denied depressive, manic, anxiety, or psychotic symptoms. He denied any medication side effects. A mental status exam revealed that Plaintiff was alert and

oriented and appropriately groomed. He behaved cooperatively, and his mood, affect, attention, concentration, speech, and thought process were normal. He denied hallucinations and suicidal and homicidal ideation (Filing 19-7, Tr. 321).

On November 16, 2017, Plaintiff saw Chinyere Nyenke, M.D., at SATF, who noted that Plaintiff had a history of photophobia following excision of a brain tumor approximately 7 years prior. Plaintiff said, "everything appears gray in the light with some 'pulling' sensation in the back of his eyes." He stated that dark glasses improved his symptoms, and that he only wore them in bright light. Plaintiff described his bipolar disorder as well-controlled and denied and depressive symptoms. Dr. Nyenke noted that Plaintiff was alert and oriented, pleasant, calm, and cooperative, and his affect was normal. Dr. Nyenke advised Plaintiff not to wear his glasses inside his cell and referred him to an ophthamologist for further evaluation (Filing 19-7, Tr. 315-316).

A November 30, 2107, treatment note by Michell Pacheco, RN, at SATF did not mention medication side effects (Filing 19-7, Tr. 314).

On December 8, 2017, Plaintiff saw Anthony Hales, NP, at SATF, who noted that Plaintiff was alert and oriented, was pleasant, calm, and cooperative, and exhibited a normal affect (Filing19-7, Tr. 314-315).

On December 13, 2017, personnel at the Los Angeles County Sheriff's Department evaluated Plaintiff for housing following his release from prison. At intake, he stated that he was legally blind (seeing only blacks and gray shadows) and experienced seizures due to a prior brain tumor. He said that his last seizure occurred in April 2017. Margarita Lambiaso, RN, conducted a mental status exam, which was unremarkable. Another registered nurse, Victor Banuelos, noted that though Plaintiff claimed to be legally blind, he made "very good eye contact" and appeared "very observant." RN Banuelos also assessed Plaintiff's mental status as normal. (Filing 19-7, Tr. 335-340).

On December 17, 2107, Behnam Ghahramani, a social worker, noted that Plaintiff refused his breakfast and said he was on a hunger strike at the Los Angeles County jail, advocating for his return to housing for inmates with legal impairments. Mr. Ghahramani noted that Plaintiff was adequately groomed and cooperative, and

his mood, affect, speech, insight, judgment, and impulse control were unremarkable (Filing 19-7, Tr. 341-342).

On December 19, 2017, Plaintiff saw Don Balbas, a mental health counselor at the jail. His mental status examination was normal (Filing 19-7, Tr. 341).

On December 20, 2017, Plaintiff saw Mr. Ghahramani again. His mental status examination was normal (Filing 19-7, Tr. 342).

On February 9, 2018, Plaintiff submitted a Function Report – Adult to the Social Security Administration. Plaintiff stated that, on a typical day, he went for walks, played with his dog, and listened to music. He admitted that he was able to care for his dog, manage his personal care independently, prepare simple meals using a microwave, and perform household chores like making the bed and washing dishes. Plaintiff stated that he went outside daily, and that he got around by walking or riding a bus. He stated that he did not drive because he was unable to see. He shopped in stores for food, clothing, music, and other daily necessities. Plaintiff stated that his hobbies included music, listening to books, walking, and "moving around outside anywhere". He spent time with others and went to church, the library, the park, and the "group center." However, Plaintiff also stated that he had difficulty getting along with others (Filing 19-6, Tr. 219-224).

Regarding his functional abilities, Plaintiff alleged problems with seeing, memory, concentration, understanding, following instructions, completing tasks, and getting along with others, including authority figures. He said that he lost jobs because of his problems getting along with people. Plaintiff stated that he used a walking/tapping cane "every minute – every day" since having brain surgery in 2009. In one section of his report, Plaintiff alleged that his medication made him feel "tired and dizzy;" however, elsewhere in the same report the only side effect mentioned was a "soft Peter" from taking Prozac (Filing 19-6, Tr. 224-226).

On March 14, 2018, Walter C. Roberts, M.D., performed a consultative ophthalmological examination. Plaintiff reported a history of brain surgery for meningioma 9 years prior with poor visual acuity since that time. Dr. Roberts noted that Plaintiff's visual acuity without glasses was "CF" (counts fingers) and that refraction was of no help. The remainder of Plaintiff's examination was within

normal limits, but Dr. Roberts diagnosed Plaintiff with cortical blindness based on his history (Filing 19-7, Tr. 354).

On March 24, 2018, state agency medical consultant Judy Martin, M.D., reviewed the medical evidence of record and found that Plaintiff had moderate limitations in his abilities to interact with others; concentrate, persist, and maintain pace; and adapt and manage himself, and a mild limitation in his ability to understand, remember, and apply information. Dr. Martin also considered Plaintiff's functional abilities and assessed him as capable of carrying out simple, repetitive instructions over the course of a normal workweek without extra supervision. She also concluded that Plaintiff was capable of functioning adequately in a setting that did not require extensive interactions with the public and that he was able to adapt to a routine workplace setting (Filing 19-3, Tr. 115, 119-120).

On May 22, 2018, the Cooperative Disability Investigations (CDI) Unit[4] issued a summary report of its fraud investigation, which revealed that Plaintiff was functioning at a higher level than alleged in his application and supporting materials (Filing 19-7, Tr. 388-392).

The CDI investigator obtained records from the California Department of Motor Vehicles (DMV), which showed that Plaintiff had a valid California driver license with an issue date of February 10, 2014. DMV records also indicated that Plaintiff had a motorcycle registered in his name, valid through May 28, 2017 (Filing 19-7, Tr. 390). During a telephone call with the investigator, Plaintiff revealed that he had his own government-issued cell phone (Filing 19-7, Tr. 390). The investigator spoke with Plaintiff's stepson, James, who stated that Plaintiff borrowed vehicles from other family members to "get around" (Filing 19-7, Tr. 390).

---

[4] The Cooperative Disability Investigations (CDI) program  is a joint effort of the Social Security Administration (SSA) and the Office of the Inspector General (OIG), in partnership with State Disability Determination Services (DDS) agencies and State and local law enforcement agencies. The Units investigate disability claims under SSA's Title II and Title XVI programs that State disability examiners believe are suspicious. *See* https://oig.ssa.gov/cooperative-disability-investigations-cdi/.

The investigator also visited a homeless shelter in Los Angeles, and an employee (Witness 1) identified Plaintiff as one of the facilities prior residents. Witness 1 stated that Plaintiff claimed he was blind and used a walking stick at times; however, Witness 1 often saw Plaintiff walking "just fine" with no stick or other assistive device. Witness 1 stated that he did not think Plaintiff was really blind because he navigated throughout the interior of the large homeless shelter without the stick and walked outside without any assistive device and without difficulty. His hygiene and grooming were good (Filing 19-7, Tr. 391).

Another employee of the shelter, Witness 2, also stated that he observed Plaintiff walking "fine" without the use of an assistive device. In particular, Plaintiff was able to walk through the inside of the property, up and down steps within the facility, and outside the property. Witness 2 stated that Plaintiff did not appear disoriented while walking and Witness 2 did not believe Plaintiff was blind (Filing 19-7, Tr. 391).

A third shelter employee, Witness 3 stated that Plaintiff was not blind and he walked without a stick or any other assistive device. Plaintiff often recognized Witness 3 from far away and would call his name and say hello. Witness 3 reported that Plaintiff had no trouble reading or signing documents given to him during his intake process, and he never asked for assistance or said that he was unable to see the documents. While a resident at the facility, Plaintiff had to meet with his caseworker to review and sign a weekly progress report; Plaintiff was able to read and sign the reports on his own. Witness 3 observed Plaintiff using a cell phone. Plaintiff sometimes left the facility carrying a suitcase; other times, Plaintiff arrived at the facility carrying grocery bags in his hands. Witness 3 saw Plaintiff wearing sunglasses outside, but never saw him wearing reading glasses (Filing 19-7, Tr. 391-392).

On June 13, 2018, state agency medical consultant Michael Barricks, M.D., reviewed the evidence of record, including the CDI report, and concluded that Plaintiff did not have a medically determinable visual impairment (Filing 19-3, Tr. 114).

On June 20, 2018, state agency medical consultant B. Vaghaiwalla, M.D., reviewed the medical evidence of record and determined that Plaintiff was capable

of performing work at the medium exertional level, except that he could never climb ladders, ropes, or scaffolds, and he must avoid all exposure to hazards due to his history of seizures (Filing 19-3, Tr. 117-118).

On June 11, 2019, Ran Sankaranem, M.D., wrote a letter stating that Plaintiff was an inpatient at CHI Health, Immanuel Medical Center in Omaha, Nebraska, from June 10 to June 12, 2019 due to continuous episodes of seizures due to noncompliance with medication. Hospital records for the visit stated Plaintiff had traumatic injury with biting and marks on his tongue with swelling and intermittent confusional episodes concerning for a postictal state. Dr. Sankaranem started Plaintiff on Keppra and Plaintiff had no further seizure events. Dr. Sankaranem told Plaintiff to continue taking Keppra and to follow up with a neurologist. (Filing 19-7, Tr. 365, 367-368).

On July 26, 2019, the Office of Hearing Operations sent Plaintiff a Notice of Hearing. The letter informed Plaintiff of his right to representation and included a pamphlet titled Your Right to Representation (Filing 19-4, Tr. 147-152, 154-155).

On August 29, 2019, the Office of Hearing Operations sent Plaintiff a letter informing him of his right to representation at the administrative hearing. The letter included another copy of the pamphlet titled Your Right to Representation and a list of resources (Filing 19-6, Tr. 248-253).

On September 26, 2019, Plaintiff saw Sonia Acharya-Gupta, M.D., at Charles Drew Health Center in Omaha, Nebraska. Though Dr. Acharya-Gupta listed diagnoses of seizure disorder, diabetes screening, paranoid schizophrenia, muscle spasm, legal blindness, depression, and anxiety, the treatment notes included no relevant findings (Filing 19-7, Tr. 385).

On October 8, 2019, Plaintiff returned to the Charles Drew Health Center. His treatment goals included learning to handle frustration and tension; controlling his actions and thoughts; and gaining employment through community involvement. The treatment notes included no mental status examination findings (Filing 19-7, Tr. 430).

On October 18, 2019, Plaintiff's mother, Patricia Baker, submitted a letter on Plaintiff's behalf. She described Plaintiff's medical history, including his physical and mental impairments (Filing 19-6, Tr. 274).

At the October 23, 2019 administrative hearing, which was conducted in Omaha, the ALJ noted Plaintiff's lack of representation and asked Plaintiff if he wanted to delay the hearing so that he could obtain a qualified representative. Plaintiff conferred with his mother and decided to waive his right to representation and move forward with the hearing (Filing 19-2, Tr. 56-59).

Plaintiff testified that his mental conditions, seizures, and vision kept him from working. He stated that he experienced hallucinations and aggressive thoughts, and sometimes acted aggressively towards others. Plaintiff testified that he received mental and physical care at Charles Drew Health Center. He said he attended weekly behavioral therapy sessions beginning the previous summer. Plaintiff also said that he had seizures "constantly," including grand mal seizures twice weekly. He also testified to migraine headaches that occurred "all the time" for which he took Tylenol. He testified that he experienced chest pain due to having been shot and stabbed, and that Nitroglycerin did not relieve his pain. Plaintiff stated that his seizures, headaches, and chest pain had worsened over the last two years. Plaintiff said that he only saw shadows and had to use a magnifying glass to see things better. He also said that his tinted glasses had "magnifiers" in them, unlike "regular" glasses. Plaintiff said that he never used a computer because he could not see the screen. He indicated that he could not retrieve a jug of milk from the refrigerator and pour himself a glassful. When he was in an unfamiliar place, he asked for directions and then held a wall to guide himself. Plaintiff said that he had a service dog provided to him by the Braille Institute in Los Angeles. He also pointed out that he brought a cane to the hearing, and except for when he was in prison and had an escort, he used it all the time. Plaintiff said that his vision had worsened since 2009. (Filing 19-2, Tr. 61-70, 77, 80-87, 91-92, 95-97).

Except for his brief hospitalization at Immanuel for a seizure in June 2019 and his treatment at the Charles Drew Health Center in 2019, Plaintiff admitted that he did not receive any medical treatment for his impairments during the relevant period.

11

Plaintiff stated that he did not have insurance and/or Medicaid in Nebraska. (Filing 19-2, Tr. 71-72).

Although he lived in his mother's basement, Plaintiff maintained that he did not "depend" on his mother. He stated that he spent his time attending therapy at the Charles Drew Health Center and visiting the Salvation Army for rehabilitation treatment and behavior therapy. He also visited Community Alliance. (Filing 19-2, Tr. 72-74).

Plaintiff maintained that he was unable to drive, and that he had not done so since 2009 (Filing 19-2, Tr. 78).

At the administrative hearing, Karen Terrill, a VE, also testified (Filing 19-2, Tr. 54-55, 100-102). The VE testified that her testimony was consistent with the Dictionary of Occupational Titles (DOT) (Filing 19-2, Tr. 100-101).

The ALJ asked the VE whether any jobs existed in the national economy for an individual who could perform medium work with no climbing of ladders, exposure to unprotected heights or operation of motor vehicles; understand, remember, carry out and persist at simple, straightforward, and uncomplicated tasks; exercise proper judgment; respond appropriately to routine supervision and changes in the workplace; and respond and behave appropriately with others when performing tasks requiring no more than incidental and superficial social interaction (Filing 19-2, Tr. 101).

The VE responded that that an individual with that RFC could perform the jobs of kitchen helper (DOT 318.687-010), with 130,000 jobs nationwide; counter supply worker. (DOT 319.687-010), with 95,000 jobs nationwide; and lab equipment cleaner (DOT 318.687-022), with 29,000 jobs nationwide (Filing 19-2, Tr. 102).

### III. STANDARD OF REVIEW

The court may reverse the Commissioner's findings only if they are not supported by substantial evidence or result from an error of law. *Nash v. Comm'r, Soc. Sec. Admin.*, 907 F.3d 1086, 1089 (8th Cir. 2018); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by

substantial evidence, shall be conclusive....”). Under this standard, a court looks to an existing administrative record and asks whether it contains sufficient evidence to support the agency’s factual determinations. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). Substantial evidence is “more than a mere scintilla.” *Id.* (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938) It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.” *Id.* (quoting *Consolidated Edison*, 305 U.S. at 229).

In determining whether evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner’s decision. If substantial evidence supports the Commissioner’s conclusion, the court may not reverse merely because substantial evidence also supports the contrary outcome and even if the court would have reached a different conclusion. *Nash*, 907 F.3d at 1089. The Eighth Circuit has repeatedly held that a court should “defer heavily to the findings and conclusions of the Social Security Administration.” *Wright v. Colvin*, 789 F.3d 847, 852 (8th Cir. 2015).

“The Social Security Act generally precludes consideration on review of evidence outside the record before the [Commissioner].” *Delrosa v. Sullivan*, 922 F.2d 480, 483 (1991) (citations omitted). The court, however, may remand to the [Commissioner] for consideration of new evidence where such evidence is material and the claimant demonstrates good cause for failing to submit the new evidence at the administrative level.” *Id.*; 42 U.S.C. § 405(g). To be considered material, the new evidence must be “non-cumulative, relevant, and probative of the claimant's condition for the time period for which benefits were denied.” *See Woolf v. Shalala*, 3 F.3d 1210, 1215 (8th Cir.1993). Furthermore, it must be reasonably likely that the Commissioner’s consideration of this new evidence would have resulted in an award of benefits. *See id.*; *Jones v. Callahan*, 122 F.3d 1148, 1154 (8th Cir. 1997).[5]

---

[5] Plaintiff has attached numerous exhibits to his brief (Filing 33 at 23-105) which cannot be considered by the court in determining whether the Commissioner’s decision is supported by substantial evidence. Nor has Plaintiff made the requisite showing for a remand based on newly discovered evidence. S*ee, e.g., Allen v. Astrue*, 781 F. Supp. 2d 868, 877 (D. Neb. 2011) (new evidence provided with plaintiff’s brief would not be considered by the district court, and case would not be remanded

The Court must also determine whether the Commissioner's decision is based on legal error. *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011). Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law." *Id*. (citing *Brueggemann v. Barnhart*, 348 F.3d 689, 692 (8th Cir. 2003); *Nettles v. Schweiker*, 714 F.2d 833, 836 (8th Cir. 1983)). No deference is owed to the Commissioner's legal conclusions. *Brueggemann*, 348 F.3d at 692 (stating allegations of legal error are reviewed de novo).

## IV. ISSUES PRESENTED

Liberally construing Plaintiff's combined motion and brief, the issues in this case are (1) whether the ALJ properly evaluated Plaintiff's symptoms; (2) whether the ALJ properly assessed Plaintiff's RFC; (3) whether substantial evidence supported the ALJ's step-five finding that Plaintiff was not disabled; (4) whether the ALJ fully developed the record; and (5) whether Plaintiff received a fair hearing. (See Filing 33 at 2-22.) As will be discussed below, the answer to each of these questions is "Yes."

## V. DISCUSSION

### A. The ALJ's Evaluation of Plaintiff's Symptoms

Plaintiff first contends the ALJ failed to properly evaluate his symptoms. See Pl.'s Br. (Filing 33) at 2, 7, 9, 11. Specifically, Plaintiff alleges the ALJ did not consider the effects of the medications he took. This allegation lacks merit.

In *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984), the Eighth Circuit held, in evaluating a claimant's subjective complaints and related functional limitations, the ALJ should consider: the absence of objective medical evidence; the claimant's prior work record; and observations by third parties (including treating and examining physicians) regarding such matters as (1) the claimant's daily activities; (2) the duration, frequency, and intensity of pain or other symptoms; (3) any

_____

for consideration of such evidence at the administrative level because plaintiff did not demonstrate good cause for failing to submit the new evidence).

precipitating and aggravating factor; (4) the dosage, effectiveness, and side effects of medication; and (5) the claimant's functional restrictions. *Polaski*, 739 F.2d at 1322. The Eighth Circuit also recognized "[t]he ALJ is in the best position to gauge the credibility of testimony and is granted deference in that regard." *See Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002). If the ALJ explicitly discredits a claimant's subjective complaints and gives good reasons, the Eighth Circuit has held it will defer to the ALJ's judgment, even if the ALJ does not cite to *Polaski* or discuss every factor in depth. *See Schultz v. Astrue*, 479 F.3d 979, 983 (8th Cir. 2007); *Strongson v. Barnhart*, 361 F.3d 1066, 1072 (8th Cir. 2004).

Here, the ALJ applied the proper legal standard (Filing 19-2, Tr. 34), made express findings (Filing 192, Tr. 35), and provided valid reasons for his assessment of Plaintiff's subjective complaints and alleged functional limitations, including the lack of objective medical evidence to support Plaintiff's alleged functional limitations, his failure to seek medical treatment during the relevant period, Plaintiff's own reports regarding his functioning, and the opinions of state agency medical and psychological consultants to the effect that Plaintiff retained the RFC to unskilled work at the medium exertional level (Filing 19-2, Tr. 32-33, 35-39).

Plaintiff's sole argument regarding the ALJ's symptom evaluation is that he did not address the side effects of his medications. See Pl.'s Br. (Filing 33) at 2, 7, 9, 11. However, "an ALJ need not explicitly discuss each factor." *Schwandt v. Berryhill*, 926 F.3d 1004, 1012 (8th Cir. 2019). Furthermore, the Eighth Circuit has recognized there are instances when an ALJ does not have to discuss a claimant's statements about the side effects of his medications. *See Buckner v. Astrue*, 646 F.3d 549, 558 (8th Cir. 2011) ("The ALJ did not err by failing to discuss expressly some of the other factors, including any side effects from [claimant's] medications."); *Hajek v. Shalala*, 30 F.3d 89, 92 (8th Cir. 1994) (dismissing claim that the ALJ committed error by failing to discuss statements regarding the side effects of medications where "there was no evidence that he ever mentioned these side effects to his physicians."); *see also Sanders v. Astrue*, No. 4:08CV3125, 2009 WL 226031, at *11 (D. Neb. Jan. 29, 2009) (rejecting claimant's argument that the ALJ failed to evaluate the side effects of her medications where claimant presented no evidence

to show that she discussed side effects with her doctors and never previously alleged that medication side effects contributed to her alleged disability).

Although Plaintiff alleged in one disability report that his medications made him feel tired and dizzy (Filing 19-6, Tr. 224), those allegations did not appear in other reports, and Plaintiff even denied that he was taking medication at times (Filing 19-6, Tr. 213, 239, 259-260, 274, 289-290, 298, 302; Filing 19-7, Tr. 390). Plaintiff also never reported side effects to his treatment providers (Filing 19-7, Tr. 308-310, 314-318, 323, 329-342, 385, 430). In October 2017, just a few months before he filed for SSI benefits, Plaintiff denied experiencing any medication side effects (Filing 19-7, Tr. 321).

**B. The ALJ's Assessment of Plaintiff's RFC**

Plaintiff next argues the ALJ erred in assessing his RFC. See Pl.'s Br. (Filing 33) at 1-10, 12, 14-17, 21. This allegation also is without merit.

As the ALJ properly noted, a claimant's RFC is his ability to do physical and mental work activities on a sustained basis despite limitation from his impairments (Filing 19-2, Tr. 29). See 20 C.F.R. § 416.945. Although the RFC determination is a medical question that requires some medical evidence, it is an administrative determination reserved to the Commissioner. *See Cox v. Astrue*, 495 F.3d 614, 619-20 (8th Cir. 2007); *Guilliams v. Barnhart*, 393 F.3d 798, 803 (8th Cir. 2005); 20 C.F.R. 416.927(d), 416.946(c). The ALJ determines a claimant's RFC based on all the relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own description of her limitations. *See Sultan v. Barnhart*, 368 F.3d at 864 (8th Cir. 2004); *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); 20 C.F.R. § 416.945. Further, it is the ALJ's responsibility to resolve questions of credibility and questions arising from conflicting medical evidence. See Estes, 275 F.3d at 725.

Here, the ALJ's RFC finding is proper under this standard, as he reached this finding by considering the record as a whole, including the objective findings in the treatment record, the opinions of state agency medical consultants, the opinions of

consultative examiners and Plaintiff's medical sources, and Plaintiff's reported activities of daily living (Filing 19-2, Tr. 33-39). Substantial evidence supports his finding that Plaintiff could perform a range of unskilled, medium work.

Plaintiff's contends the ALJ should have accounted for his visual impairment in assessing his RFC. See Pl.'s Br. (Filing 33) at 2, 5-12, 14-17. However, "[t]he RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments ...." SSR 96-8P, 1996 WL 374184, at *1 (July 2, 1996). In this case, the ALJ determined at step two[6] that Plaintiff did not have a medically determinable visual impairment (Filing 19-2, Tr. 30-31). Thus, the ALJ properly excluded visual restrictions from Plaintiff's RFC (Filing 19-2, Tr. 34).

Further, the record does not support visual limitations. In particular, the Cooperative Investigations Unit's investigative report showed that Plaintiff was able to read and complete paperwork without any assistive device, use a microwave and cell phone, maintain his personal hygiene, go shopping, and use a computer (Filing 19-2, Tr. 30; Filing 19-6, Tr. 208; Filing 19-7, Tr. 390-391). He maintained a valid drivers' license until 2018 (Filing 19-2, Tr. 30; Filing 19-7, Tr. 390, 413). The evidence also showed that Plaintiff was not noted as using a cane at medical appointments during the relevant period, and staff at the homeless shelter stated that Plaintiff had no trouble navigating the large facility without a stick and he was also able to walk outside the facility without an assistive device (Filing 19-2, Tr. 31; Filing 19-7, Tr. 391). Although Plaintiff alleged a visual impairment, and reported limited vision at a medical appointment, the record showed that he was not visually impaired as alleged.

---

[6] To the extent that Plaintiff meant to challenge the ALJ's step two finding, he has not shown reversible error. The ALJ cited to extensive evidence in determining that Plaintiff had not established a medically determinable visual impairment or, in the alternative, statutory blindness pursuant to Listing 2.02 (Filing 19-2, Tr. 30-31). This same evidence supports the ALJ's finding that Plaintiff did not show that visual limitations affected his RFC.

Contrary to Plaintiff's argument, the ALJ considered his seizure disorder in assessing Plaintiff's functional limitations. See Pl.'s Br. (Filing 33), at 5-7, 9-10, 15-17. In particular, the ALJ determined that Plaintiff received treatment for seizures only once during the relevant period (Filing 19-2, Tr. 35). He also noted that the record included no evidence of regularly occurring seizures (Filing 19-2, Tr. 36). Despite the limited evidence, the ALJ included seizure precautions, e.g., no climbing of ladders or other exposure to unprotected heights and no operation of motor vehicles (Filing 19-2, Tr. 34). These restrictions adequately account for any functional limitations stemming from Plaintiff's seizure disorder.[7]

The ALJ also properly considered functional limitations resulting from Plaintiff's mental impairments in assessing his RFC (Filing 19-2, Tr. 34). See Pl.'s Br. (Filing 33) at 2-5, 7-11, 14-17. Specifically, the ALJ noted that Plaintiff received very limited medical treatment during the relevant period (Filing 19-2, Tr. 36). Plaintiff did not offer any explanation for why he did not seek free or low-cost treatment (Filing 19-2-, Tr. 36). The evidence of record did not support Plaintiff's allegation of violent or psychotic behavior, as the available evidence showed an absence of psychotic symptoms, appropriate behavior, and good response to medication (Filing 19-2, Tr. 37, 72, 83-84; Filing 19-7, Tr. 313-323, 329-342, 367-368, 385, 430). The ALJ nonetheless restricted Plaintiff to the performance of simple, straightforward, and uncomplicated tasks; incidental and superficial social interaction; and routine supervision and routine changes in the workplace (Filing 19-2, Tr. 34). Plaintiff has not met his burden of showing that additional mental restrictions were warranted.

It is Plaintiff's burden to establish his RFC. *Buford v. Colvin*, 824 F.3d 793, 796 (8th Cir. 2016). The ALJ was not required to include additional functional limitations when the record did not support them.

---

[7] The ALJ found no other medically determinable physical impairments (Filing 19-2, Tr. 29). Thus, he fully accounted for all of Plaintiff's physical limitations in assessing his RFC.

### C. The ALJ's Step-Five Finding

In his third allegation of error, Plaintiff contends the ALJ erred in relying on VE testimony based on the Dictionary of Occupational Titles (DOT). See Pl.'s Br. (Filing 33) at 3, 13-15, 17, 21. Specifically, he alleges that the DOT is categorically obsolete, and that the VE's identification of jobs that a person with Plaintiff's vocational profile and RFC would be capable of performing cannot serve as substantial evidence for the ALJ's step 5 finding. Again, this allegation lacks merit.

A VE's testimony, based on a properly phrased hypothetical question, constitutes substantial evidence to support the ALJ's step five finding. *See Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir. 1996). Here, the ALJ's hypothetical included all the limitations he found warranted (Filing 19-2, Tr. 34, 101). The VE testified that an individual with those limitations and claimant's age, education, and work experience could perform the jobs of kitchen helper, counter supply worker, and lab equipment cleaner at the medium exertional level (Filing 19-2, Tr. 102). The ALJ properly relied upon VE testimony in this case, and substantial evidence supports the ALJ's step five finding. *See Moore v. Astrue*, 623 F.3d 599, 604 (8th Cir. 2010).

Contrary to Plaintiff's argument, the Code of Federal Regulations provides that the DOT is a reliable source of job information:

> When we determine that unskilled, sedentary, light, and medium jobs exist in the national economy (in significant numbers either in the region where you live or in several regions of the country), we will take administrative notice of reliable job information available from various governmental and other publications ... [including] Dictionary of Occupational Titles, published by the Department of Labor.

20 C.F.R. § 404.1566(d)(1). The Eighth Circuit also recognizes the DOT as a proper source for job descriptions. *See Thomas v. Berryhill*, 881 F.3d 672, 678 (8th Cir. 2018). Thus, the VE did not err in relying on the DOT, and the ALJ, in turn, properly relied on the VE's testimony. Substantial evidence of record supported the ALJ's findings at step five of the sequential evaluation.

### D. The ALJ's Duty to Develop the Record

In his fourth allegation of error, Plaintiff argues the ALJ should have further developed the record. *See* Pl.'s Br. (Filing 33) at 1, 8. However, it is the Plaintiff's responsibility to provide specific medical evidence to support his claim. 20 C.F.R. § 416.912(a); *see Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006). The burden of proof remains at all times on the claimant to prove disability and present the strongest case possible. *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991). The ALJ is only required to develop a reasonably complete record. *Clark v. Shalala*, 28 F.3d 828, 830-831 (8th Cir. 1994). In determining whether an ALJ fully and fairly developed the record, the proper inquiry is whether the record contained sufficient evidence for the ALJ to make an informed decision. *Haley v. Massanari*, 258 F.3d 742, 749-750 (8th Cir. 2001); *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995).

Here, the record contained sufficient evidence for the ALJ to make an informed decision regarding the extent and limiting effects of Plaintiff's impairments. In addition to the available medical records (Filing 19-7, 307-323, 329-342, 354-357, 360-361, 363, 365, 367-368, 370-383, 385, 394, 396-400, 402, 404-405, 415-418, 421, 430), the ALJ had the benefit of a prior consultative psychological evaluation and the state agency medical experts' opinions (Filing 19-3, Tr. 110-111, 113-114, 117-120; Filing 19-7, Tr. 410-414), an investigative report from the Cooperative Disability Investigations unit (Filing 19-7, Tr. 387-392), function reports from Plaintiff and a third party (Filing 19-6, Tr. 206-213, 219-227), a letter from Plaintiff's mother (Filing 19-6, Tr. 274), and hearing testimony from Plaintiff describing his alleged impairments and limitations, medical treatment, and activity level (Filing 19-2, Tr. 54-55, 60-100). Thus, the ALJ had an adequate basis for making his disability determination.

Plaintiff does not specify what additional evidence was necessary to develop the record in his case. *See George v. Astrue*, 301 F. App'x 581, 582 (8th Cir. 2008) (rejecting allegation that the ALJ failed to develop the record on the basis that claimant failed to specify what records the ALJ should have sought). At one point in his brief, Plaintiff even avers that the ALJ had sufficient evidence to make a decision. *See* Pl.'s Br. (Filing 33) at 8 ("What more evidence [was needed] to be

included for the decision-making purpose?"). Elsewhere in his brief, Plaintiff makes a vague reference to the ALJ's duty to "acquire more records if needed and assist." *Id.* at 1. Reversal for failure to develop the record is proper only where such failure is unfair or prejudicial. *See Haley*, 258 F.3d at 748; *Onstad v. Shalala*, 999 F.2d 1232, 1234 (8th Cir.1993). "Without informing the court what additional medical evidence should be obtained . . . [plaintiff] has failed to establish that the ALJ's alleged failure to develop the record resulted in prejudice and has therefore provided no basis for remanding for additional evidence." *Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005).

### E. Plaintiff's Right to a Fair Hearing

In his final allegation of error, Plaintiff claims he was not afforded a fair hearing. See Pl.'s Br. (Filing 33) at 1-2, 6-8, 11-12, 16, 19, 21. Specifically, Plaintiff argues the ALJ should have postponed the hearing so Plaintiff could obtain representation, and he complains the ALJ did not permit him to call a lay witness to testify on his behalf. There is no merit to these arguments.

Plaintiff received multiple written notices advising him of his right to have a representative at the hearing—in August 2018 and July 2019 (Filing 19-4, Tr. 133, 149, 154-155). *See Shepherd v. Chater*, 1996 WL 224104, at *1 (8th Cir. 1996) (finding that claimant knowingly and intelligently waived representation where she received four notices informing her of her right to representation). At the February 2021 hearing, the ALJ advised Plaintiff of his right to a representative again (Filing 19-2, Tr. 56-59). He offered to recess the hearing to allow Plaintiff additional time to obtain an attorney (Filing 19-2, Tr. 57-58). Instead, Plaintiff elected to continue with the hearing (Filing 19-2, Tr. 59). Given Plaintiff's ability to submit a hearing request, and to present himself at his scheduled hearing and testify, nothing indicates that his recognized mental impairments rendered him unable to make a competent waiver of his right to representation. Plaintiff was fully aware of his right to be represented at his hearing but waived that right. *See Frederick v. Saul*, 2020 WL 7029508, at *10 (D. Neb. Nov. 30, 2020) (finding a knowing waiver where the ALJ reiterated claimant's right to representation at the hearing and there was no

indication that claimant lacked the mental capacity to understand her right to representation).

Plaintiff also contends that the ALJ prevented him from calling his mother as a witness during the administrative hearing. See Pl.'s Br. (Filing 33) at 2. However, Plaintiff did not ask the ALJ to call any witnesses (Filing 19-2, Tr. 54-105). In addition, the record already included the October 2019 written statement from Plaintiff's mother (Filing 19-6, Tr. 274). Plaintiff has not shown that his mother would have provided evidence that was not duplicative of his own testimony or of her written statement. *See* HALLEX I-2-6-60(B) ("[T]he ALJ is not required to permit testimony that is repetitive or cumulative").

## VI. CONCLUSION

The court finds that the Commissioner's decision is supported by substantial evidence on the record as a whole and is not contrary to law.

Accordingly,

IT IS ORDERED that:

1. Plaintiff's Motion for an Order Reversing the Commissioner's Decision (Filing 33) is denied.

2. Defendant's Motion to Affirm the Commissioner's Decision (Filing 37) is granted.

3. Judgment will be entered by separate document providing that the decision of the Commissioner is affirmed.

Dated this 17th day of November 2021.

BY THE COURT:

*Richard G. Kopf*

Richard G. Kopf
Senior United States District Judge